UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| THOMAS M. GOLDSBERRY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:08-cv-322-JMS-WGH |
| | ) | |
| DR. ROHANNA, | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**<u>Introduction</u>**

This matter is before the court on Defendant's Motion for Summary Judgment filed April 8, 2010. (Docket No. 52). Plaintiff filed a Response on June 14, 2010. (Docket Nos. 65-67). A Reply was filed on June 29, 2010. (Docket No. 72).

**<u>Background</u>**

The facts in the light most favorable to the non-moving party are as follows.

On January 12, 2006, Plaintiff transferred to the Putnamville Correctional Facility ("Putnamville"). (Affidavit of Dr. Marcel Rohana ("Rohana Aff.") ¶ 5; authenticated medical records of Thomas Goldsberry from the Putnamville Correctional Facility ("Putnamville Medical Records") at 1). Plaintiff's stay at Putnamville ended on August 2, 2008. (Rohana Aff. ¶ 5).

Defendant, Dr. Marcel Rohana[1], is the former Medical Director of and

---

[1] While the Caption in this case has Dr. Rohana's name spelled "Rohanna," the Court notes that numerous other court documents including an affidavit signed by Dr. Rohana, spell his name with one "n."

treating physician at the Putnamville Correctional Facility.  (*Id.* ¶ 3).  In addition to
Dr. Rohana, Dr. James Fenoglio was also a treating physician at Putnamville.  (*Id.*
¶ 6).

While at Putnamville, Plaintiff was on chronic care for Hepatitis C and
chronic ear problems.  (Rohana Aff. ¶ 8).  As a chronic care offender, Plaintiff was
seen every 12 weeks for those conditions.  (*Id.*)  He was also treated for knee and
back pain. (*Id.*)  Dr. Rohana alleges that his treatment of Plaintiff was limited to a
few, isolated instances.  (*Id.*)

When Plaintiff entered Putnamville on January 12, 2006, he reported that
he had right ear drainage.  (Putnamville Medical Records at 1).  Dr. Fenoglio
examined Plaintiff in the chronic care clinic on April 12, 2006.  (*Id.* at 2-3; Rohana
Aff. ¶ 9). Plaintiff reported that he had a chronic ruptured right ear drum.
(Rohana Aff. ¶ 9).  Dr. Fenoglio prescribed Cortisporin Otic to help prevent ear
infection.  (Putnamville Medical Records at 4; Rohana Aff. ¶ 9).

On May 1, 2006, Dr. Fenoglio examined Plaintiff in doctor sick call.
(Putnamville Medical Records at 5).  On May 3, 2006, Dr. Rohana prescribed
Amoxicillin for 10 days to help prevent ear infection.  (*Id.* at 6; Rohana Aff. ¶ 10).

On May 10, 2006, Plaintiff submitted a request for healthcare, stating that
he had an ear infection that was draining blood.  (Putnamville Medical Records at
7).  Plaintiff was seen in nursing sick call on May 12, 2006, and was referred to
the doctor.  (*Id.*)

On May 23, 2006, Dr. Rohana renewed Amoxicillin for 30 days, to help fight
ear infection.  (Putnamville Medical Records at 8; Rohana Aff. ¶ 10).  On June 27,

2006, Dr. Rohana again renewed Amoxicillin for another 30 days to help prevent ear infection.  (Putnamville Medical Records at 9; Rohana Aff. ¶ 10).

On July 5, 2006, Dr. Fenoglio examined Plaintiff again in chronic care. (Putnamville Medical Records at 11-12; Rohana Aff. ¶ 10).  Dr. Fenoglio noted that Plaintiff was taking Amoxicillin for ear infections and he ordered Cortisporin Otic drops, to help further prevent ear infection.   (Putnamville Medical Records at 10-12; Rohana Aff. ¶ 10).

On July 16, 2006, Plaintiff submitted a request for healthcare asking for Vaseline and cotton balls for his ear; he also asked when he would have his eardrum repaired.  (Putnamville Medical Records at 13).  Dr. Fenoglio responded to Plaintiff's request on July 19, 2006, and stated that he would see Plaintiff in sick call.  (*Id.*)  On July 20, 2006, Dr. Fenoglio examined Plaintiff and ordered one jar of Vaseline for ninety days and cotton balls if possible.  (*Id.* at 14).  He also submitted a consultation request for an evaluation with an Ear Nose and Throat specialist ("ENT").  (*Id.*)

On July 24, 2006, Dr. Rohana met with Plaintiff to discuss Dr. Fenoglio's referral to an ENT.  (Rohana Aff. ¶ 11; Putnamville Medical Records at 15).  Dr. Rohana indicated that, at that time, he did not feel that an ENT referral was medically necessary, because Plaintiff's condition was a chronic condition that had been present for several years.  (Dr. Rohana Aff. ¶ 11).  Furthermore, according to Dr. Rohana, tympanic membranes often heal on their own, so he thought it prudent to wait and see if Plaintiff's ear drum would heal itself.  (*Id.*)  Dr. Rohana felt that Plaintiff's condition could be appropriately managed on-site at

the prison.  (*Id.*)  Dr. Rohana did not tell Plaintiff to wash his ear out in the shower, but told him to use water precautions.  (*Id.*)

On July 28, 2006, Plaintiff submitted a request for healthcare stating that he needed cotton balls, because the Commissary was out of stock. (Putnamville Medical Records at 16). In response to this request, Plaintiff was scheduled for nursing sick call, but did not show up for the appointment.  (*Id.*)

On August 10, 2006, Plaintiff submitted a request for healthcare, stating that he needed more cotton balls to use in caring for his ruptured eardrum.  (*Id.* at 17).  In response to this request, Plaintiff was seen by a nurse on August 11, 2006.  (*Id.*)

On August 21, 2006, Plaintiff submitted a request for healthcare, stating that he needed more cotton balls.  (Putnamville Medical Records at 18).  In response to this request, on August 23, 2006, medical staff sent him a pass to pick up his cotton balls.  (*Id.*)

On September 4, 2006, Plaintiff submitted a request for healthcare, stating that he needed more Vaseline and cotton balls to keep water out of his ears. (Putnamville Medical Records at 19).  In response to this request, medical staff noted on September 7, 2006, that Plaintiff should pick up his Vaseline and cotton balls after his x-ray.  (*Id.*)

On September 22, 2006, Plaintiff submitted a request for healthcare stating that he thought he was getting another ear infection because his right ear hurt and he heard popping and sloshing noises.  (Putnamville Medical Records at 20). In response to this request, Plaintiff was seen in nursing sick call and referred to

the doctor.  (*Id.*)  Dr. Fenoglio saw Plaintiff on September 25, 2006.  (*Id.* at 21).
Dr. Fenoglio prescribed antibiotic ear drops.  (*Id.*)

On October 16 and 31, 2006, Plaintiff submitted requests for healthcare
requesting more cotton balls.  (Putnamville Medical Records at 22, 24).  Medical
staff sent Plaintiff passes in response to Plaintiff's requests to pick up his cotton
balls on October 18 and 31, 2006.  (*Id.* at 22, 24).

On November 7, 2006, Plaintiff submitted a request for healthcare that he
was low on Vaseline and cotton balls.  (*Id.* at 25).  Then, on November 17, 2006,
Plaintiff submitted a request for healthcare that he was out of Vaseline and cotton
balls.  (*Id.* at 26).  Medical staff sent Plaintiff a pass to pick up Vaseline and cotton
balls.  (*Id.*)

On December 20, 2006, Dr. Fenoglio examined Plaintiff in chronic care
clinic.  (Putnamville Medical Records at 28).  Dr. Fenoglio noted that Plaintiff's
right tympanic membrane was red, perforated, and air blew out of his ear when he
blew his nose.  (*Id.*)  On January 25, 2007, Plaintiff submitted a request for
healthcare seeking more Vaseline and cotton balls.  (*Id.* at 29).  A nurse gave a
correctional officer Plaintiff's pass to pick up his Vaseline and cotton balls.  (*Id.*)

Plaintiff was seen in chronic care clinic on March 14, 2007, and was noted
to be doing well.  (*Id.* at 30).  On March 16, 2007, Plaintiff submitted a request for
healthcare that he was low on Vaseline and cotton balls.  (*Id.* at 31). He received a
pass to pick up these items on March 18, 2007.  (*Id.*)

On May 3, 2007, Plaintiff submitted a request for healthcare wanting his
order for cotton balls and Vaseline re-filled.  (Putnamville Medical Records at 32).

-5-

He did not want to be seen in nursing sick call, but just wanted more cotton balls and Vaseline. (*Id.*) Nurse Vada Yates responded to Plaintiff on May 4, 2007, and stated that Plaintiff's ear needed to be evaluated on an on-going basis to ensure it healed properly. (*Id.*) She noted that his last order for cotton balls and Vaseline was dated December 20, 2006, and that it had expired. (*Id.*) She said that if he still needed cotton balls and Vaseline, he would receive them when he was assessed by medical staff. (*Id.*)

On May 8, 2007, Plaintiff submitted a request for healthcare stating that he did not receive the last two passes to come to medical because his dorm officer threw the passes away while he was at work. (Putnamville Medical Records at 33). He asked to receive cotton balls and Vaseline for his right ear that day or to be seen by the doctor. (*Id.*) On May 18, 2007, Plaintiff submitted a request for healthcare that he needed to be called to medical to see the doctor for his ear evaluation. (*Id.* at 34). On May 21, 2007, Plaintiff was seen in nursing sick call and was referred to the doctor. (*Id.*) Dr. Fenoglio ordered cotton balls and Vaseline for ninety days. (*Id.* at 35).

On June 12, 2007, Plaintiff was seen in nursing sick call for complaints of right hand numbness, pain, and his request for a bottom bunk pass. (Putnamville Medical Records at 36). The nurse noted that Plaintiff had complications with Vaseline and cotton balls and that perhaps ear plugs might be more efficient. (*Id.*) The nurse referred Plaintiff to the doctor. (*Id.*) On July 31, 2007, Plaintiff submitted a request for healthcare stating that Dr. Fenoglio's order for cotton balls and Vaseline was expired and he needed the order renewed. (*Id.* at 37). In

response to this request, a nurse sent Plaintiff a new pass for cotton balls and Vaseline.  (*Id.*)

On September 30, 2007, Plaintiff submitted a request for healthcare that he was having problems with his right ear and needed to be seen in chronic care. (Putnamville Medical Records at 39).  In response to this request, nursing staff referred Plaintiff to the doctor on October 2, 2007.  (*Id.* at 38). Plaintiff saw Dr. Fenoglio on October 25, 2007, in chronic care clinic.  (*Id.* at 40-41).  Dr. Fenoglio noted that he was unable to visualize Plaintiff's right tympanic membrane.  (*Id.*)

On November 8, 2007, Dr. Rohana met with Plaintiff again to discuss his chronic ear problems.  (Rohana Aff. ¶ 12; Putnamville Medical Records at 42). Dr. Rohana noted that Plaintiff first came to the Department of Correction in December 2003 and that at that time Plaintiff reported that he had damaged his ear in a bomb blast.  (Putnamville Medical Records at 42).  Dr. Rohana noted that Plaintiff was seen by a physician in late 2003 and early 2004 for a right ear infection.  (*Id.*)  Dr. Rohana noted that he would speak with an ENT to determine if Plaintiff should be referred out.  He did, however, explain to Plaintiff that if the injury to his ear occurred prior to his incarceration, then this might be a situation where the injury to his ear was not medically necessary to repair and could not worsen.  (*Id.* at 40).

On November 29, 2007, Dr. Rohana submitted a consultation request for Plaintiff to be evaluated by an ENT.  (Rohana Aff. ¶ 13; Putnamville Medical Records at 43-47).  Dr. Rohana felt that a referral to an ENT was appropriate at this time because Plaintiff had been at the prison for almost 2 years, Plaintiff's

eardrum was apparently not healing itself, and Plaintiff was concerned about his condition.  (Rohana Aff. ¶ 13).  Dr. Rohana, therefore, referred Plaintiff to an ENT to confirm that there was nothing further that should be done for Plaintiff's condition.  (*Id.*)

On December 5, 2007, medical assistant Darla Scherb scheduled Plaintiff's appointment with an ENT at Wishard Hospital ("Wishard").  (Rohana Aff. ¶ 13; Putnamville Medical Records at 48).  On December 14, 2007, Dr. Fenoglio examined Plaintiff for a chronic perforated right eardrum.  (Putnamville Medical Records at 49).  The right ear appeared normal on examination except that his tympanic membrane appeared to be absent.  (*Id.*)  Dr. Fenoglio noted that Plaintiff was scheduled to see an ENT in January 2009.  (*Id.*)  He also noted that Plaintiff wanted Vaseline and cotton balls to keep water out of his ear when he showered.  (*Id.*)

On January 22, 2008, Plaintiff went to Wishard to see an ENT.  (*See* authenticated medical records of Thomas Goldsberry from Wishard Hospital ("Wishard Medical Records") at 4-5, 8-9; Rohana Aff. ¶ 14; Putnamville Medical Records at 50-53).  Plaintiff reported to the ENT at Wishard that he had a tympanoplasty of the right ear at IU in 1995 following trauma and that he continued to have drainage.  (Wishard Medical Records at 4-5, 8-9)  The ENT noted crusting of the posterior superior pars flaccida.  (*Id.*)  The ENT ordered a CT scan of the tympanic bone and ear drops for the right ear to help prevent infection.  (*Id*; Rohana Aff. ¶ 14; Putnamville Medical Records at 50-53).  An audiometric assessment revealed moderately severe mixed hearing loss in the

right ear.  (Wishard Medical Records at 4-5, 8-9).

Later on January 22, 2008, after Plaintiff returned to the prison, a nurse noted that he needed a CT scan and to return in four weeks to Wishard. (Putnamville Medical Records at 54).  The nurse also noted that Plaintiff returned with a prescription, which would be forwarded to the doctor.  (*Id.*)  A follow-up appointment was requested in four weeks.  (*Id.*)  On January 27, 2008, Dr. Rohana instructed medical staff to schedule an appointment with Plaintiff in seven to ten days to discuss his recent hospital visit.  (*Id.* at 55).  On January 29, 2008, Plaintiff submitted a request for healthcare stating that he had not yet had his prescription filled from Wishard.  (*Id.* at 56). A nurse responded to this request on February 2, 2008, and informed Plaintiff that his medication had been ordered and should arrive that day or the next and that medical staff would send a pass for Plaintiff when the medication arrived.  (*Id.*)

On February 4, 2008, Dr. Rohana examined Plaintiff to discuss his recent hospital visit.  (Putnamville Medical Records at 57-62).  Dr. Rohana submitted a consultation request for a CT scan of the tympanic bone in the right ear.  (*Id.*; Rohana Aff. ¶ 15).  Dr. Rohana alleges that he did not order cotton balls and Vaseline because those were not recommended by the ENT.  (Rohana Aff. ¶ 15). The consultation request met the criteria and the CT scan was scheduled. (Wishard Medical Records at 7; Putnamville Medical Records at 57-62).  Dr. Rohana also ordered the Domeboro otic medication that Wishard had prescribed. (Putnamville Medical Records at 57-62).

On February 10, 2008, Plaintiff submitted a request for healthcare for a

pass to pick up cotton balls and Vaseline.  (Putnamville Medical Records at 63).
On February 13, 2008, medical staff responded to this request and informed
Plaintiff that there was no need for these supplies.  (*Id.*)  On February 15, 2008,
Plaintiff submitted a request for healthcare asking medical staff to clarify why
there was no need for him to have cotton balls and Vaseline.  (*Id.* 64). Medical staff
responded to Plaintiff on February 18, 2008, and told him that Dr. Rohana felt
that there was no longer a need for cotton balls and Vaseline. (*Id.*)

On March 6, 2008, Plaintiff had a CT scan of the tympanic bone at Wishard.
(Wishard Medical Records at 3; Rohana Aff. ¶ 16; Putnamville Medical Records at
65-67).  The results of the CT scan reveal that there was "complete fluid
opacification of the right mastoid air cells, with strandy fluid and/or soft tissue
partially filing the right hypotympanum, tympanic cavity, and
epitympanum–including Prussak's space."  The examiner also observed soft tissue
and/or inflammatory debris circumferentially surrounding the proximal external
auditory canal.  The examiner opined that these findings revealed sequelae of
chronic right otomastoiditis.  He also indicated that superimposed early acquired
cholesteatoma would be difficult to excluded.  ((Wishard Medical Records at 3).

On April 28, 2008, Plaintiff submitted a request for healthcare that he had
an ear infection because he could not keep his ear dry because he was refused
Vaseline and cotton balls.  (Putnamville Medical Records at 68).  In response to
this request, Plaintiff was scheduled for nursing sick call on May 1, 2008.  (*Id.* at
68-70).  However, Plaintiff refused to be seen in nursing sick call because he did
not want to be charged for the appointment because his problem was a chronic

condition. (*Id.*)

On May 11, 2008, Plaintiff submitted a request for health care requesting to know the progress on his right ear drum repair.  (Putnamville Medical Records at 71).  He also claimed that his ear was infected, bled occasionally, and smelled awful.  (*Id.*)  Dr. Rohana responded to this request and noted that Plaintiff should be seen in chronic care.  (*Id.*)  On May 29, 2008, Plaintiff submitted a request for healthcare stating that his ear was bleeding because he could not keep water out of it.  (*Id.* at 72).  In response to this request, Plaintiff was seen in nursing sick call the following day and referred to the doctor after brown material was visualized in his right ear.  (*Id.* at 72-76).

On May 30, 2008, it was noted that the ENT ordered Vaseline and cotton balls and so Dr. Fenoglio ordered Vaseline and cotton balls for ninety days. (Putnamville Medical Records at 75).  On June 2, 2008, Plaintiff submitted a request for healthcare asking why repair of his eardrum has stalled since he had his CT scan.  (*Id.* at 77).  In response to this request, Dr. Fenoglio wrote, "I'm sorry, we will refer you back down to ENT surgery today."  (*Id.*)  On June 11, 2008, Dr. Fenoglio referred Plaintiff to Wishard for an ENT follow-up.  (Putnamville Medical Records at 78-82).

On July 1, 2008, Plaintiff went to Wishard for a follow-up exam with the ENT.  (Wishard Medical Records at 2, 6; Rohana Aff. ¶ 17; Putnamville Medical Records at 83-85).  The ENT prescribed Augmentin for two weeks; Domeboro Otic twice daily; and Ofloxacin Otic Solution for 14 days.  (Putnamville Medical Records at 83-85).  The ENT also recommended a follow-up in three weeks, and that if

Plaintiff's problems persisted, he may need a right tympanomastoid surgery for chronic otomastoiditis.  (*Id.*)  When Plaintiff returned to the prison the same day, Dr. Fenoglio submitted a formulary exception request for Domebnoro Otic drops and Ofloxacin drops.  (Putnamville Medical Records at 86-89). He also ordered Vaseline and cotton to keep water out of Plaintiff's ears for two weeks.  (*Id.*)

On July 10, 2008, Dr. Fenoglio examined Plaintiff and noted that he had not received one of his ear drops and none of his Augmentin.  (Putnamville Medical Records at 92-93).  Dr. Fenoglio submitted a formulary exception request for Augmentin.  (*Id.* at 94-95).  On July 13, 2008, Plaintiff saw a nurse to discuss supplies for self-care of his ears.  (*Id.* at 96-97).  On July 15, 2008, Plaintiff was a no-show for nursing sick call.  (*Id.* at 98-99).  On July 26, 2008, Plaintiff was seen in nursing sick call for supplies for self-care of his ears.  (*Id.* at 100-101).

On August 2, 2008, Plaintiff transferred to the Lakeside Correctional Facility ("Lakeside"). (Rohana Aff. ¶ 18; Putnamville Medical Records at 102).  Medical staff at Putnamville did not schedule Plaintiff's follow-up appointment at Wishard Hospital prior to his transfer.  (Rohana Aff. ¶ 18).

On August 8, 2008, Plaintiff filed suit against numerous defendants.  He filed an Amended Complaint on February 20, 2009, naming eleven separate defendants.  Pursuant to the screening required by 28 U.S.C. § 1915A the Court determined that all claims against all parties must be dismissed except for the claim against Defendant, Dr. Rohana, in his individual capacity.  Plaintiff's only remaining claim is that Defendant is liable under 42 U.S.C. § 1983 for violations of the Eighth Amendment to the U.S. Constitution.  Namely, Plaintiff alleges that

Defendant acted with deliberate indifference to his serious medical needs.  (*See* Amended Complaint at 3).

Defendant filed his Motion for Summary Judgment arguing that all claims against him must be dismissed because there was no deliberate indifference toward Plaintiff.  Having examined the parties' briefs and the relevant case law, the Court concludes that Defendant's motion must be GRANTED.

## Summary Judgment Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  When ruling on the motion, the Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor.  *Id.* at 255.  If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).  Lastly, the moving party

need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## Analysis

Plaintiff argues that Defendant was deliberately indifferent to his serious medical needs.  Plaintiff alleges that he suffered from a chronic infection of his right ear and that Defendant acted with deliberate indifference in two distinct ways: 1) by delaying treatment; and 2) by providing inadequate treatment.

As a prisoner, Plaintiff must demonstrate that he was deprived of his rights under the Eighth Amendment to the U.S. Constitution.  The Eighth Amendment prohibits cruel and unusual punishment.  U.S. CONST. amend. VIII.  In essence, what is prohibited by the Eighth Amendment is the "unnecessary and wanton infliction of pain."  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).  Hence, the Eighth Amendment protects prisoners from "deliberate indifference" to serious medical needs, including delayed access to medical care.  *Id*. at 104-05.

In order to establish a violation of the Eighth Amendment, Plaintiff must show: 1) that his medical needs were objectively serious; and 2) an official knew of and disregarded an excessive risk to inmate health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  For a medical need to qualify as objectively serious, it must be a need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Wynn v.*

*Southward*, 251 F.3d 588, 593 (7th Cir. 2001).  And, in satisfying the second prong of the test, Plaintiff must demonstrate culpability on the part of prison officials by showing that the officials were subjectively aware of his serious medical needs and disregarded an excessive risk that a lack of treatment would pose to Plaintiff's health or safety.  *Id.*

### 1. Delayed Treatment

Plaintiff's first argument is that he suffered from delayed treatment for his damaged ear drum (tympanic membrane) and chronic ear infection (otomastoiditis).  The medical records reveal that Plaintiff was treated at Putnamville by two different doctors: Defendant Dr. Rohana and Dr. Fenoglio; Plaintiff was also under the care of several other medical staff.  Defendant appears to have first examined Plaintiff on May 3, 2006.  (Putnamville Medical Records at 6).  From that date until July 20, 2006, Plaintiff was seen several times by both doctors and was being treated with several antibiotic medications.  On July 20, Dr. Fenoglio examined Plaintiff and recommended referral to an ENT.  (*Id.* at 14). Dr. Rohana met with Plaintiff on July 24 and essentially overruled Dr. Fenoglio; he instead decided to continue Plaintiff on a more conservative treatment course. (Rohana Aff. ¶ 11).  Plaintiff was not seen again by Dr. Rohana until November 8, 2007, nearly one-and-a-half years later.  (Putnamville Medical Records at 42). During this time frame, Plaintiff was seen intermittently by Dr. Fenoglio and other prison medical staff.  He was treated with antibiotic eardrops over a significant portion of this time.  (*See Id.* at 10-12, 21).   Additionally, he was given Vaseline and cotton balls on numerous occasions to help keep moisture out of his ear.  On

March 14, 2007, Plaintiff was noted to be doing well after being seen at the chronic care clinic. (*Id.* at 30). And, in May 2007, Plaintiff did not even want to be seen for a nursing sick call, but simply wanted more Vaseline and cotton balls. (*Id.* at 32).

It was not until September 30, 2007, that Plaintiff expressed concerns again about his right ear. (Putnamville Medical Records at 39). Plaintiff was seen by Dr. Fenoglio as a result of this request on October 25, 2007, (*Id.* at 41) and subsequently seen by Dr. Rohana on November 8 (*Id.* at 42). The visit with Dr. Rohana resulted in a referral to an ENT on January 22, 2008. (Wishard Medical Records at 4-5, 8-9). The ENT ordered a CT scan and prescribed three types of antibiotics; two drops and one oral medication. (*Id.*)

Based on this medical evidence, the Court concludes that delay in the referral to an ENT did not amount to deliberate indifference. Dr. Rohana clearly did not disregard an excessive risk to Plaintiff's safety. In fact, while he was under Dr. Rohana's care, Plaintiff was prescribed very similar antibiotic medications to those eventually prescribed by the ENT at Wishard. Additionally, Plaintiff has not demonstrated how an earlier referral to an ENT would have resulted in better treatment of his right ear. Finally, the Court notes that Plaintiff was examined on several occasions during this time frame by Dr. Fenoglio. At no time after the first referral to an ENT did Dr. Fenoglio renew his recommendation for such a referral. There is no evidence that Dr. Rohana was directing Dr. Fenoglio's actions during this time frame. Had Dr. Fenoglio felt that a referral was warranted, such a recommendation could have appeared in the medical records. Given that Dr.

Rohana never physically examined Plaintiff during this time and given that Dr. Fenoglio never referred Plaintiff to an ENT,  Dr. Rohana was not deliberately indifferent during this time from July 2006 to November 2007.

Plaintiff alleges one other delay in medical treatment.  Plaintiff went to Wishard for a follow-up exam on July 1, 2008.  At that time, the ENT prescribed three antibiotic medications, recommended a follow-up exam in three weeks, and opined that Plaintiff might need surgery to repair his ear if the problem persisted. (Putnamville Medical Records at 83-85).  Plaintiff was transferred to Lakeside 32 days later on August 2.  (Rohana Aff. ¶ 18). Plaintiff argues that Dr. Rohana's failure to send him back to the ENT prior to his transfer to Lakeside amounted to deliberate indifference.  However, it appears from the medical records that, during this time frame, Plaintiff was being treated with the antibiotics prescribed by the ENT at Wishard.

### 2. Inadequate Treatment

Plaintiff also argues that Dr. Rohana provided inadequate treatment.  A prisoner is not required to demonstrate that he was literally ignored in order to demonstrate deliberate indifference.  *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000).  If the court were to determine that Dr. Rohana chose an "easier and less efficacious treatment," then his actions could have amounted to deliberate indifference.  *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Here, Plaintiff has failed to demonstrate that Dr. Rohana chose "easier and less efficacious treatment."  Dr. Rohana exercised his own professional judgment and determined that using antibiotic medications to treat Plaintiff's ear infection

was the proper course.  Plaintiff has not provided any medical evidence to suggest that Dr. Rohana prescribed a course of treatment that he knew to be ineffective. And, in fact, Dr. Rohana's use of antibiotic medications was similar to the treatment rendered by the ENT.  Consequently, the court concludes that Dr. Rohana did not act with deliberate indifference toward Plaintiff's serious medical need.

### Conclusion

For the reasons outlined above, Defendant's Motion for Summary Judgment is **GRANTED.**  Final judgment consistent with this opinion will now issue.

**SO ORDERED.**

Dated:   08/10/2010

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Electronic copies to:**

James F. Bleeke
SWEETIN & BLEEKE PC
jim@sweetinbleeke.com

Carol A. Dillon
SWEETIN & BLEEKE, P.C.
carol@sweetinbleeke.com

**Mail copy to:**

THOMAS M GOLDSBERRY
141087
ISP ISOE2
201 Woodlawn Ave
Michigan City, IN 46360